**Leah MAXWELL and Q'Niah Nasi, Plaintiffs,**

v.

**THE CITY OF NEW YORK, Howard Safir, former Police Commissioner of the City of New York, in his individual and official capacity, Police Officer Mannuzza, shield no. 23890, in his individual and official capacity, John and Jane Does 1 to 6, representing several unidentified police officers and the Commanding Officer of Manhattan Central Booking in their individual and official capacities, the Fat Black Pussycat, John Doe 7, representing an employee of the Fat Black Pussycat, Defendants.**

No. 01 Civ. 6670(VM).

United States District Court,
S.D. New York.

July 10, 2003.

Order Denying Reconsideration
Aug. 11, 2003.

David B. Epstein, Brooklyn, NY, Michael Oliver Hueston, Brooklyn, NY, Richard J. Cardinale, Brooklyn, NY, for Leah Maxwell.

Rose M. Weber, Assist. Corp. counsel, Michael A. Cardozo, Corp. Counsel of City of N.Y., New York City, for City of New York, Howard Safir, Officer Mannuzza.

Suzanne M. Halbardier, Barry, McTiernan & Moore, New York City, for Fat Black Pussycat.

**290**

*DECISION AND ORDER*

MARRERO, District Judge.

Plaintiffs Leah Maxwell ("Maxwell") and Q'Niah Nasi ("Nasi") (collectively, "Plaintiffs") commenced this action by filing a joint complaint, dated July 23, 2001 ("Compl." or "Complaint"), asserting claims against two groups of defendants. Maxwell, independently, sues the City of New York (the "City"), Howard Safir, former Police Commissioner of the City of New York ("Safir"), in his individual and official capacity, Police Officer Mannuzza, shield no. 23890, in his individual and official capacity ("Mannuzza") (collectively, "Municipal Defendants") for violations of her civil rights under 42 U.S.C. § 1983, and the First, Fourth, and Fourteenth Amendments to the United States Constitution, as well as for negligence under state law. Jointly, Plaintiffs assert a state law claim of negligence against the Fat Black Pussycat (the "FBP"), a bar in Greenwich Village, New York City, and Andre Blank ("Blank") (referred to as John Doe 7 in the Complaint), a male bouncer employed at FBP, who Plaintiffs allege assaulted them. In the instant motion, Municipal Defendants move for summary judgment dismissing all claims against them. For the reasons set forth below, the Municipal Defendants' motion is GRANTED in its entirety.

## I. BACKGROUND [1]

On June 26, 2000, between 2:00 a.m. and 2:30 a.m., Maxwell and Nasi arrived at FBP, which is located at 130 West 3rd Street in New York City. At some point

soon after arriving at FBP, Plaintiffs became involved in a dispute with Blank, who was monitoring the entrance to the bar. A physical altercation ultimately ensued from the verbal dispute between Maxwell and Blank, although Municipal Defendants and Plaintiffs dispute who initiated the violence. Both Maxwell and Blank allege that they sustained physical injuries from the altercation, and each claims that the other was the initial assailant.

Police Officer Mannuzza was alerted to this altercation by two transit police officers. Mannuzza arrived at the location, outside of FBP, with his partner, Officer Robert Jackson ("Jackson"), at approximately 3:23 a.m. At that point, Mannuzza spoke with Blank about what had happened, and Blank informed Mannuzza that Maxwell and Nasi were "being disorderly inside the [FBP] and [that] he asked them to leave." (Deposition of Sebastian Mannuzza ("Mann.Dep."), dated August 26, 2002, attached as Exh. C to the Declaration of John H. Graziadei ("Graz.Decl."), dated November 1, 2002, at 14.) Blank also told Mannuzza that Maxwell became angry at Blank for attempting to oust her and her friend and hit Blank on the head with her backpack. *Id.* Mannuzza testified that he observed a laceration on Blank's head, which was photographed. (*See* Graz. Decl. Exh. G.) Besides speaking with Blank, Maxwell and Nasi, Mannuzza interviewed two other eyewitnesses at the scene, Steve Krantz ("Krantz") and Kayode Penn ("Penn"), who Mannuzza asserts are independent observers since they were

---

1. The factual summary that follows derives primarily from the Complaint; City Defendant's Memorandum of Law in Support of their Motion for Summary Judgment, dated November 1, 2002; Maxwell's Memorandum of Law in Opposition to the Municipal Defendants' Motion for Summary Judgment ("Maxwell Dep."), dated December 3, 2002; Defendants' Local Rule 56.1 Statement, dated November 1, 2002; and the Declaration of Maxwell in Opposition to the Municipal Defendants' Motion for Summary Judgment ("Maxwell Decl."), dated November 26, 2002; and accompanying exhibits and affidavits attached thereto. Except where specifically referenced, no further citation to these sources will be made.

not employees of FBP nor did they have any familiarity with Blank or Plaintiffs. Krantz and Penn confirmed Blank's report, indicating that they saw Maxwell strike Blank with her knapsack.

Maxwell contests the evidence elicited by Mannuzza, arguing that Mannuzza refused to listen to her perspective or to speak to other witnesses who would have confirmed her version of the incident, and that Krantz and Penn were not objective witnesses because they were friendly with the employees of FBP. Maxwell contends that she never struck Blank and that all physical interaction between them was perpetrated by him.

Based on his observations of Blank's injury and the discussions he had with Blank and the two witnesses, Mannuzza arrested Maxwell for assault and transported her to the Sixth Precinct located at 233 West 10th Street, New York City, at approximately 3:41 a.m. Maxwell alleges that during the arrest Mannuzza used excessive force, causing injury to her head when she was pushed into the police car.

Mannuzza, Jackson, and Maxwell arrived at the Sixth Precinct at 3:45 a.m. Blank opted not to go the hospital for medical treatment. Maxwell was taken to the hospital, allegedly after numerous requests for medical attention, to treat the injuries she claimed resulted from her physical altercation with Blank. While still in the custody of the New York Police Department, Maxwell was treated at Bellevue Hospital for pains in her back and left elbow allegedly related to the injuries caused by Blank. Despite Maxwell's alleged requests, a photograph of her physical condition was not taken by Mannuzza, who also refused Maxwell's request to arrest Blank for assault. A few days later, still allegedly suffering from the physical effects of the altercation, Maxwell went to St. Lukes–Roosevelt Hospital for further treatment.

Maxwell alleges that she returned to the Sixth Precinct from the hospital at 7:00 a.m., although Mannuzza's memo book indicates she returned at 11:20 a.m., and Maxwell's medical records from Bellevue Hospital indicate that she received treatment at the hospital sometime after 10:00 a.m. Maxwell asserts that Mannuzza was very angry that she had insisted on going to the hospital, and indicated to her that, as punishment, he would delay processing her arrest. In addition to claiming delay in the processing of her arrest, Maxwell also alleges that Mannuzza retaliated against her for requesting medical treatment by denying her requests for necessary items from her backpack and for water and food, and by refusing to voucher her money, which she felt would endanger her in prison if kept on her person.

At about 1:20 p.m. on June 26, 2000, Maxwell was taken to the holding cell at the Criminal Court Building at 100 Centre Street, New York City ("Manhattan Central Booking"). Maxwell alleges that the inhumane conditions of the holding cell at Manhattan Central Booking, which she was forced to endure for approximately eight hours, violated her due process rights. Specifically, Maxwell alleges that the cell, which was approximately 10 feet by 20 feet, was extremely crowded, contained one unusable toilet filled with feces, and was infested with rodents and roaches as well as garbage and refuse. Furthermore, Maxwell complains that the cell was extremely hot and there was no ventilation, causing her to feel faint. When Maxwell asked for asthma medicine, the guards allegedly refused to provide the medicine to her. Maxwell also alleges that Safir was aware of the holding cell conditions and that no corrective measures were taken to cure these conditions.

In sum, based on the events described above, Maxwell alleges four violations of

her constitutional rights: (1) that she was falsely arrested, (2) that excessive force was used against her during the unlawful arrest, (3) that Mannuzza retaliated against her for requesting medical attention, and (4) that the conditions of her confinement at Manhattan Central Booking violated her due process rights. Municipal Defendants deny all of these charges and argue that Maxwell has not put forth sufficient evidence of these allegations to create a dispute as to a material issue of fact that would support a reasonable jury's rendering a verdict in Maxwell's favor.

## II. *DISCUSSION*

### A. *STANDARD OF REVIEW*

A motion for summary judgment should be granted where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Rodriguez v. Hahn*, 209 F.Supp.2d 344, 346 (S.D.N.Y.2002) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). The role of the Court is not to resolve issues of fact but, rather, "to determine as a threshold matter whether there are genuine unresolved issues of material fact to be tried." *Gibson v. Am. Broad. Cos.*, 892 F.2d 1128, 1132 (2nd Cir.1989). "As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505.

The moving party bears the initial burden of "informing the district court of the basis for its motion" and identifying the matter that "it believes demonstrate[s] the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323, 106 S.Ct. 2548. The nonmoving party "must support with specific evidence his assertion that a genuine dispute as to material fact does exist," *id.*, 477 U.S. at 324, 106 S.Ct. 2548, and "may not rely on conclusory allegations or unsubstantiated speculation," *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir.1998). The opposing party's showing of a genuine dispute must be grounded in concrete evidence sufficient to support a reasonable jury's rendering a verdict in his favor. *See Anderson v. Liberty Lobby*, 477 U.S. 242, 248, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). ("The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient."); *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). All ambiguities and reasonable inferences drawn from the underlying facts must be resolved in the light most favorable to the party opposing the motion. *See United States v. One Tintoretto Painting Entitled "The Holy Family With Saint Catherine and Honored Donor"*, 691 F.2d 603, 606 (2d Cir.1982) (citing *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962)).

### B. *FALSE ARREST*

Maxwell argues that because Mannuzza did not act reasonably before arresting her, probable cause for her arrest did not exist; and therefore, the arrest was false and improper. Municipal Defendants counter that since the undisputed facts support a finding of probable cause to arrest Maxwell, any claim for false arrest must be rejected as a matter of law.

▮ In order to state a claim for false arrest, a plaintiff must prove four elements: (1) the officer intended to confine the plaintiff, (2) the plaintiff was conscious

of the confinement, (3) the plaintiff did not consent to the confinement, and (4) the confinement was not otherwise privileged. *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir.1996); *Lowth v. Town of Cheektowaga*, 82 F.3d 563, 569 (2d Cir.1996). In this case, the only issue disputed by the parties is whether the arrest was privileged.

■ When an arrest is made without a warrant, for the arrest to be proper the police officer must be able to establish probable cause. *See Illinois v. Gates*, 462 U.S. 213, 241–246, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983); *United States v. Ceballos*, 812 F.2d 42, 50 (2d Cir.1987); *Raysor v. Port Authority of New York and New Jersey*, 768 F.2d 34, 39–40 (2d Cir. 1985). Here, if probable cause existed for Mannuzza to arrest Maxwell, the arrest was privileged and Maxwell's claim of false arrest is defeated.

■ Probable cause is determined on the basis of the totality of the circumstances. *See Gates*, 462 U.S. at 230–232, 103 S.Ct. 2317. Probable cause exists " 'when the arresting officer has knowledge or reasonably trustworthy information sufficient to warrant a person of reasonable caution in the belief that an offense has been committed by the person to be arrested.' " *Singer v. Fulton County Sheriff*, 63 F.3d 110, 118 (2d Cir. 1995) (quoting *O'Neill v. Town of Babylon*, 986 F.2d 646, 650 (2d Cir.1993) and *Calamia v. City of New York*, 879 F.2d 1025, 1032 (2d Cir.1989)). "The amount of evidence required to establish probable cause to arrest need not reach the level of evidence necessary to support a conviction ... but it must constitute more than rumor, suspicion, or even a strong reason to suspect." *United States v. Fisher*, 702 F.2d 372, 375 (2d Cir.1983) (internal quotations omitted). Probable cause requires a probability of criminal activity, not an actual showing of criminal activity. *See Gates*, 462 U.S. at 244 n.

13, 103 S.Ct. 2317. Moreover, probable cause may exist when the officer acts on the basis of mistaken information, as long as it was reasonable for him to rely on that information in making the arrest. *See Bernard v. United States*, 25 F.3d 98, 102 (2d Cir.1994).

■ In this case, according to Maxwell, Mannuzza relied on Blank's accusations and allegedly failed to properly consider Maxwell's perspective on the events that had transpired at FBP. However, Mannuzza also spoke with two eyewitnesses, Penn and Krantz, who, at the time in question, Mannuzza would have had no reason to suspect were not neutral third-parties, since they indicated that they did not know either Blank or Maxwell and were not employees of the FBP. These two witnesses attested to having observed the altercation and identified Maxwell as having assaulted Blank with her knapsack. Identification by neutral eyewitnesses has been determined to suffice for a finding of probable cause by an arresting officer. *See Singer*, 63 F.3d at 119 (concluding that an unequivocal identification of a suspect by an eyewitness is sufficient to provide probable cause); *Carson v. Lewis*, 35 F.Supp.2d 250, 260 (E.D.N.Y.1999) (noting that eyewitness identification of a suspect provides probable cause even where it is based upon mistaken information, as long as the arresting officer reasonably relied upon that information.)

Moreover, Mannuzza himself observed a laceration on Blank's head. Finally, in being called to the scene, Mannuzza was alerted that "Fems" (females) were causing trouble; therefore, other officers had already alluded to Maxwell and Nasi as being the aggressors. (*See* the Sprint Report, attached as Exh. D to the Graz. Decl.) Maxwell does not dispute these fundamental facts. Taken in their entirety, these uncontested facts create a sufficient

basis for Mannuzza to have reasonably believed there was probable cause to arrest Maxwell for assault. *See Ricciuti v. N.Y.C. Trans. Author.*, 124 F.3d 123, 128 (2d Cir.1997); *Golino v. City of New Haven*, 950 F.2d 864, 870 (2d Cir.1991) (2d Cir.1994) (probable cause exists when "reasonably trustworthy information sufficient to warrant a person of reasonable caution in the belief that an offense has been committed by the person to be arrested.") In other words, regardless of what actually transpired on the morning of June 26, 2003, whether Maxwell or Blank was responsible for the physical altercation between them, or whether they were both partly responsible, the Court finds that, given the circumstances, Mannuzza acted reasonably in arresting Maxwell.

■ Although the existence of probable cause is predominately factual in nature, often making such an inquiry proper for jury consideration, where the pertinent events and the knowledge of the officers is not disputed, summary judgment is proper. *See Weyant*, 101 F.3d at 852 ("The question of whether or not probable cause existed may be determinable as a matter of law if there is no dispute as to the pertinent events and the knowledge of the officer."); *Murphy v. Lynn*, 118 F.3d 938, 947 (2d cir.1997). Here, the pertinent facts are not disputed. It is uncontested that Officer Mannuzza arrived at the scene after having been notified that certain females were causing trouble, that he observed a laceration on Blank's head and that two seemingly impartial eyewitnesses identified Maxwell as having assaulted Blank.

■ Moreover, Mannuzza is protected from liability in this case by the doctrine of qualified immunity. Qualified immunity shields police officers from being subject to personal liability for damages for conduct that "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). "Summary judgment on the basis of qualified immunity is appropriate when the only conclusion a rational jury could reach is that reasonably competent police officers could under the circumstances disagree about the legality of the arrest." *Ricciuti*, 124 F.3d at 127 (citing *Lennon v. Miller*, 66 F.3d 416, 421 (2d Cir.1995)). Here, qualified immunity protects Mannuzza from liability because it was reasonable for him to believe that the arrest of Maxwell was a legal arrest based on probable cause.

Maxwell's arguments in response to the evidence proffered by Municipal Defendants do not create an issue of material fact to be resolved by a jury. Maxwell makes three primary arguments: (1) there were additional witnesses at the scene of the crime not interviewed by Mannuzza that would have corroborated her version of the events; (2) because Blank is significantly larger than Maxwell, Mannuzza must have reasonably suspected that Blank caused the altercation at issue; (3) because Maxwell was more seriously injured than Blank, Mannuzza should have been more suspect of Blank's actions. The Court is not persuaded that these arguments undermine probable cause in this case.

The fact that two apparently neutral eyewitnesses corroborated Blank's version of the events is strong enough support for Mannuzza to have reasonably believed there was probable cause, even if other witnesses, who Maxwell alleges were willing to make statements on her behalf but were ignored by Mannuzza, made conflicting statements about what transpired. Blank's own testimony supported by two eyewitnesses sufficiently created probable cause to arrest Maxwell. *See Hardin v.*

*Meridien Foods,* No 98 Civ. 2268, 2001 WL 1150344, at *4 (S.D.N.Y. Sept.27, 2001) ("[T]wo statements, combined with [the officer's] personal observation, provided probable cause for the arrest of plaintiff.") Although other witness testimony corroborating Maxwell's version of the events may have created probable cause to arrest Blank as well, that issue is not before the Court. In other words, even if the officers had taken exculpatory statements from Maxwell and her allegedly corroborating witnesses, probable cause existed to arrest Maxwell because Mannuzza nonetheless could have credited Blank's statement, supported by the two eyewitnesses, as a reliable version of the events that took place between Maxwell and Blank.

Moreover, "summary judgment on the issue of probable cause may be appropriate even if the police could have taken additional steps to secure evidence or rule out alternatives." *Richards v. City of New York,* No. 97 Civ. 7990, 2003 WL 21036365, at *15 (S.D.N.Y. May 7, 2003); *accord Gisondi v. Town of Harrison,* 72 N.Y.2d 280, 532 N.Y.S.2d 234, 528 N.E.2d 157, 160 (1988). As the *Gisondi* court noted:

> Similarly, the police are not obligated to pursue every lead that may yield evidence beneficial to the accused, even though they had. In short, the police and prosecutors cannot be said to have improperly concealed evidence every time the plaintiff is able to show that they could have done more or could have disclosed more. What is required is proof that the police conduct deviated egregiously from statutory requirements or accepted practices applicable in criminal cases.

*Id.; see also Ricciuti,* 124 F.3d at 128 ("Once a police officer has a reasonable basis for believing there is probable cause, he is not required to explore and eliminate every theoretically plausible claim of inno-

cence before making the arrest."); *Krause v. Bennett,* 887 F.2d 362, 372 (2d Cir.1989) ("It would be unreasonable and impractical to require that every innocent explanation for activity that suggests criminal behavior be proved wrong, or even contradicted, before an arrest warrant could be issued with impunity.") Thus, having been satisfied that he had gathered a reasonable picture of the incident that occurred, Mannuzza was under no obligation to examine all other possible versions and elements of the incident.

In addition, although Maxwell asserts that witnesses at the scene would have given testimony supporting her version of the incident that occurred between Maxwell and Blank, there is no evidence that those witnesses gave any actual statements or came forward to Mannuzza to confirm Maxwell's assertions in any way, nor did Maxwell submit any evidence demonstrating what these putative witnesses would have said—on the record at hand, they are just hypothetical witnesses invoked for purposes of the instant motion. The mere assertion that these hypothetical witnesses would have corroborated Maxwell's version of the altercation is self-serving and conclusory and does not provide sufficient support to create a dispute concerning a material fact to be determined by a jury.

Maxwell relies heavily on *Kuehl v. Burtis,* 173 F.3d 646 (8th Cir.1999), in support of her argument that Mannuzza's investigation at the scene of her arrest was not sufficiently thorough to support a determination of probable cause to arrest her. However, upon close analysis, *Kuehl* is readily distinguished from the case at hand.

The Eighth Circuit in *Kuehl* noted the need for a limit on the latitude given to law enforcement officers in interpreting and drawing inferences form factual circum-

stances, explaining that "[a]n officer contemplating an arrest is not free to disregard plainly exculpatory evidence, even if substantial inculpatory evidence (standing by itself) suggests that probable cause exists." *Id.* at 650 (citing *Bigford v. Taylor,* 834 F.2d 1213, 1218 (5th Cir.1988)). Moreover, the Eighth Circuit warned that "[l]aw enforcement officers have a duty to conduct a reasonably thorough investigation prior to arresting a suspect, at least in the absence of exigent circumstances ..." *Id.* (citations omitted). Rather, the *Kuehl* court held that when minimal further investigation would have exonerated the suspect, such investigation is required. *Id.*

In *Kuehl,* however, the additional evidence, presumably ignored or overlooked by the arresting officers, was "plainly exculpatory" and pronounced. First, the court found that the officer must have observed the "sizeable bruise over the [plaintiff's] left eye." *Id.* at 651. Here, Maxwell points to her ripped clothing, allegedly ignored by Mannuzza, but ripped clothing does not create the same degree of cause for suspicion of an alleged victim's story as does a highly visible physical head wound. More importantly, in *Kuehl,* there was substantiated evidence of witness testimony actually brought to the arresting officer's attention, in the form of a sworn statement from an eyewitness, that the plaintiff was in fact the victim of an assault and had simply acted in self-defense. *Id.; see also Richards,* 2003 WL 21036365, at *19 ("In this case ... plaintiffs have not merely suggested that police could have found more evidence to support their case ... Rather, plaintiffs have offered proof that defendants had evidence in their possession ... that negated probable cause.") Here, there is no such substantiated evidence in the record that a plainly exculpatory eyewitness's account of the underlying events was presented to and ignored by Mannuzza; Maxwell merely alleges that witnesses would have confirmed her version of the altercation had they been questioned. However, she produces no proof of the existence of these witnesses except her own self-serving statements and that of her co-plaintiff, Nasi. Moreover, the witness ignored by the defendant in *Kuehl* was characterized as "the only witness who saw the entire altercation between [the parties]." *Id.* at 648. Here, there were numerous witnesses to the events that occurred, and the two who were interviewed by Mannuzza happened to inculpate Maxwell and lend support to the prior information that Mannuzza had received about the incident and that coincided with his own observations at the scene.

Maxwell argues that Mannuzza's investigation was constitutionally deficient, similar to the finding in *Kuehl,* in that he failed to examine the "totality of the circumstances," and that based on the appearance and demeanor of Blank, his determination of probable cause to arrest Maxwell was improper and unlawful. First, Maxwell argues that because she went to the hospital and Blank did not, there is evidence that she was more injured during the altercation and therefore the more likely victim. However, that Maxwell chose to go to the hospital while Blank did not, does not mean, without more, that Mannuzza would have readily perceived that Maxwell was more seriously injured than Blank, especially where, as here, Maxwell's alleged injuries were apparently internal and Blank's injury was, at least in part, external and visible to Mannuzza. Moreover, the extent of an alleged injury in and of itself does not provide instant proof to an officer at the scene of who instigated an altercation, who or what caused the injury, or that an injured person did not also assault another. Given the context presented, that Maxwell may have been injured during the altercation does not necessarily exculpate her. Simi-

larly, neither Blank's size nor his demeanor make it unreasonable for Mannuzza to find probable cause that Maxwell assaulted him.

In sum, the Court finds that based on the undisputed facts in the record, Mannuzza had a reasonable basis for determining that probable cause existed for him to arrest Maxwell for the assault of Blank. The arguments raised by Maxwell to undermine probable cause do not raise a material issue of fact for a jury because they are either unsupported and self-serving or because no rational jury could determine, based on the arguments presented, that Mannuzza could not have reasonably concluded that probable cause existed for Maxwell's arrest.

## C. *EXCESSIVE FORCE*

■■■ Maxwell also contends that Mannuzza subjected her to excessive force during her arrest. An excessive force claim is properly brought under the Fourth Amendment of the United States Constitution, which guarantees citizens the right " 'to be secure in their persons ... against unreasonable seizures' of the person." *Graham v. Connor*, 490 U.S. 386, 394, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989) (quoting *Tennessee v. Garner*, 471 U.S. 1, 5, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985)). To establish an excessive force claim, "a plaintiff must show that the force used by the officer was, in light of the facts and circumstances confronting him, 'objectively unreasonable' under Fourth Amendment standards." *Finnegan v. Fountain*, 915 F.2d 817, 823 (2d Cir.1990). The reasonableness of the force used is considered from the perspective of a reasonable officer at the scene of the crime. *Id.* The severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether the plaintiff is actively resisting arrest, are also properly considered in determining the reasonableness of the force used.

*Id.* The right to make an arrest necessarily carries with it the right to use a certain degree of physical coercion or threat to effect the arrest: " '[N]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers' violates the Fourth Amendment." *Graham*, 490 U.S. at 394, 109 S.Ct. 1865 (quoting *Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir.1973)). It is the plaintiff's burden to prove that the officer acted unreasonably. *See Glick*, 481 F.2d at 1033. The Second Circuit has held that "a *de minimis* use of force will rarely suffice to state a constitutional claim." *Romano v. Howarth*, 998 F.2d 101, 105 (2d Cir.1993).

In accordance with Maxwell's deposition testimony, the following consists of Mannuzza's physical contact with Maxwell following her arrest: (1) after Maxwell stood up and put her hands behind her back, "[Mannuzza] put handcuffs on [Maxwell]" and "grabbed the chain, swirl[ing] [Maxwell] around" (deposition testimony of Maxwell ("Maxwell Dep."), dated June 12, 2002, attached as Exh. I to the Graz. Decl., at 74); (2) Mannuzza walked her to the police vehicle and "pushed [her] in the car—pushed [her] in the back seat" or "shoved [her] into the back seat" (*Id.*); (3) as she was pushed into the police car, Maxwell "scraped [her] forehead against the thing [metal partition] that divides the perps from the police officer" (*Id.* at 75–76). Maxwell, at her deposition, specifically indicates that she does not recall that she had any further physical contact with Mannuzza. (*Id.* at 73–74.)

■■■ In an effort to elaborate on her excessive force claims, Maxwell submits additional testimony concerning the excessiveness of the force used against her by Mannuzza. She indicates in her affidavit that Mannuzza "violently jerk[ed][her] by the chain of the handcuffs," causing her body to jerk and then "violently shoved

[her] head first into the police car," and that his force in pushing her into the police car, caused her to "strike the solid partition inside the police car." For the most part, Maxwell simply elevates the tone of her testimony by adding adjectives, but generally, since this is an excessive force claim, she descriptively enhances the degree of the alleged force used against her by inserting these adjectives. Moreover, with regard to being pushed in head first, in her additional affidavit she directly contradicts her deposition testimony, in which she indicates, in response to being questioned if she was pushed in head first, "I was shoved. I don't know. It was just like 'get in.'" (Maxwell Dep. at 74–75.)

The Court can not countenance Maxwell's attempt to put a different gloss on particular testimony she gave under oath in the presence of her counsel. "A party may not create an issue of fact by submitting an affidavit in opposition to a summary judgment motion that, by omission or addition, contradicts the affiant's previous deposition testimony." *Hayes v. New York City Dep't of Corrections*, 84 F.3d 614, 619 (2d Cir.1996); *accord Raskin v. Wyatt Co.*, 125 F.3d 55, 63 (2d Cir.1997); *Dawson v. Bumble & Bumble*, 246 F.Supp.2d 301, 307 (S.D.N.Y.2003). The Court is not convinced that Maxwell's original testimony was "ambiguous, confusing or incomplete" so as to warrant elaboration. *Palazzo v. Corio*, 232 F.3d 38, 43 (2d Cir.2000). Rather, during her deposition, Maxwell was thoroughly questioned with regard to Mannuzza's physical contact with her during the arrest, and Maxwell answered the questions posed to her in a clear and unambiguous manner. Accordingly, the Court will make its determination based on Maxwell's original testimony at her deposition and will not credit her later elaborations.

The Court is not persuaded that the alleged force used by Mannuzza was in any way excessive so as to cross the constitutional threshold. The process of an arrest—putting handcuffs on a suspect and coercively escorting him to a police car—necessarily involves some minimal amount of force, as Maxwell herself illustrates when she testified, "It was just like, get in," (Maxwell Dep. at 74–75). That Maxwell allegedly scraped her head when being shoved into the car is not sufficient for any reasonable jury to find an excessive force claim in this case—minor scrapes, bumps or bruises potentially could occur, often unintended, during any arrest, and an arresting office can not be held unremittingly liable for every such incident. Viewed as a whole, the minimal force used by Mannuzza against Maxwell to arrest her and escort her into the police car could not support a reasonable finding by a rational jury that excessive force was used by Mannuzza in connection with Maxwell's arrest.

Moreover, the cases cited by Maxwell to support her excessive force claim all involve allegations of significantly more force than those asserted here. In *Calamia v. City of New York*, the plaintiff was allegedly shoved to the floor, bound with handcuffs that were unduly tight, and kept in that restrained position for five to six hours. 879 F.2d 1025, 1035 (2d Cir.1989). In *Kerman v. City of New York*, the plaintiff was allegedly confined to a restraint bag in a painful position for a considerable period of time. 261 F.3d 229, 233, 238–240 (2d Cir.2001). Qualitatively, the force involved in the arrests at issue in those cases is incomparable, in ways that amount to more than differences in degree, to the nature and extent of the physical contact Maxwell claims took place in this case, where no extraordinary act of force is alleged.

## D. *RETALIATION*

Next, Maxwell claims that, after arresting her, Mannuzza retaliated against her

for her exercise of protected speech. Specifically, Maxwell argues that because she insisted on being taken to the hospital for medical attention, Mannuzza intentionally prolonged processing her arrest and transferring her to Manhattan Central Booking. Maxwell also complains that Mannuzza retaliated against her by denying her requests for water and food, as well as her request to attend to her sanitary needs. Finally, Maxwell contends that Mannuzza retaliated against her by refusing to voucher money that she had in her backpack, thus placing her in danger when she entered the jail population at Manhattan Central Booking.

To assert a retaliation claim pursuant to the First Amendment, a plaintiff must first establish that: (1) she engaged in conduct or speech that is protected by the First Amendment; and (2) the defendant responded with retaliation, and the protected activity was a substantial or motivating factor in the alleged retaliatory action. *See Cancel v. Goord*, No. 00 Civ. 2042, 2002 WL 171698, at *4 (S.D.N.Y. Feb. 4, 2002) (citing *Posr v. Court Officer Shield # 207*, 180 F.3d 409, 418 (2d Cir. 1999)). Finally, if the plaintiff satisfies these two requirements, the defendant has the opportunity to defeat the claim by demonstrating by a preponderance of the evidence that the same action would have been taken even in the absence of the protected conduct. *See Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir.1996);

*Davidson v. Chestnut*, 193 F.3d 144, 148–149 (2d Cir.1999) (per curiam).

Municipal Defendants contend that Maxwell has satisfied neither of these requirements.[2] The first question is whether Maxwell engaged in a protected activity. To be protected under the First Amendment, a plaintiff's speech must satisfy two conditions: (1) it must address a matter of public concern; and (2) the value of the plaintiff's expression must outweigh "the government's interest in the effective and efficient fulfillment of its responsibilities to the public." *Connick v. Myers*, 461 U.S. 138, 150, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983). Speech is considered a matter of public concern when it relates to a matter of political, social or communal import, as opposed to a matter of private interest. *Id.* Whether speech touches a matter of public concern is an issue to be decided by the Court as a matter of law, not by the finder of fact. *Id.*

In this case, Maxwell's alleged protected speech was her insistence that she receive medical treatment for injuries she allegedly suffered during the altercation with Blank. While not the typical protected speech most commonly considered protected, *i.e.*, bringing a lawsuit against a defendant or petitioning the government for the redress of grievances, *see, e.g., Colon v. Coughlin*, 58 F.3d 865, 871 (2d Cir.1995), one court in this district held that although doubtful that a prisoner has

2. Maxwell argues that the Court should ignore the arguments made by Municipal Defendants in their Reply Memorandum of Law in Further Support of their Motion for Summary Judgment with regard to Maxwell's retaliation claim because these arguments were not raised as part of their initial Memorandum of Law in Support of their Motion for Summary Judgment, dated November 1, 2002. However, Maxwell's Complaint is so bare that, although it mentions "retaliation for free speech" as a cause of action, the

Court is not convinced that Municipal Defendants could have fairly been on notice of the grounds for that claim. The statement of facts in the Complaint makes no mention of the facts underlying the retaliation allegations. Therefore, the Court will consider the Municipal Defendants' reply arguments, which consideration is properly within the Court's discretion. *See Keefe on Behalf of Keefe v. Shalala*, 71 F.3d 1060, 1066 n. 2 (2d Cir.1995).

a protected interest in repeatedly complaining about medical ailments, the protected nature of a right to seek basic medical treatment is assumed. *See Benitez v. Pecenco,* No. 92 Civ. 7670, 1995 WL 444352, at *5–*6 (S.D.N.Y. July 27, 1995). The parties cite no other cases that directly address whether requests for medical attention are protected speech.

Maxwell cites two cases for the proposition that her request for medical attention was a protected activity, neither of which is on point. In *Henderson,* 89 F.3d at 80, the Second Circuit held that the process of submitting a grievance concerning prison conditions is a protected activity under the First Amendment. However, the filing of prison grievances, like the filing of Equal Employment Opportunity Commission complaints, concerns the traditional protection of complaints about government or workplace conditions. Maxwell's request for medical attention, on the other hand, does not implicate these traditionally protected public interests, but rather concerns her own private health needs. Another case cited by Maxwell, *Provost v. City of Newburgh,* 262 F.3d 146, 154 (2d Cir.2001), concerns speech that is protected with regard to a basis for arrest, not retaliation, and is therefore inapposite. Municipal Defendants cite *Moleski v. Cheltenham Township,* No. 01 Civ. 4648, 2002 U.S. Dist. LEXIS 12311, at *11–*12 (E.D.Pa. Apr. 30, 2002), which entailed alleged retaliation against an inmate for informing prison guards that he was diabetic and had low blood sugar. The *Moleski* court dismissed the case, holding that speech relating to such private medical needs was not a matter of public concern protected by the First Amendment with regard to retaliation. However, since *Moleski* did not pertain to an immediate request for medical attention based on allegedly urgent need, an issue more closely related to public health concerns and general due process requirements, the Court is not persuaded that the facts in *Moleski* are directly applicable here. Rather, given a prisoner's established constitutional right to emergency medical attention under the Eighth Amendment, such a request will be deemed by the Court to be protected by the First Amendment from retaliation by prison guards. *See West v. McCaughtry,* 971 F.Supp. 1272, 1277 (E.D.Wis.1997) ("If a prisoner were disciplined solely because of his requests for proper medical treatment, it would surely be a constitutional violation.")

Maxwell must also show that Mannuzza retaliated against her for the protected activity she alleges. Municipal Defendants point to various inconsistencies between Maxwell's submissions and her allegations of retaliation. At most, based on uncontested evidence in the record, the Municipal Defendants argue that Maxwell spent approximately 30 minutes in a holding cell prior to being taken to the hospital at around 4:20 a.m. (*See* Maxwell Decl. Exh. B; Maxwell's Statement Pursuant to Local Civil Rule 56.1, dated November 30, 2002, ¶ 24.) Based on the medical documents in the record, it appears that Maxwell was taken to Manhattan Central Booking approximately two hours after being returned from the hospital. (*Id.*) Therefore, subtracting the time Maxwell spent in the hospital, based on the submissions made by Maxwell herself, which indicate that she had received medical treatment at Bellevue Hospital at around 10:00 a.m., she appears to have been at the precinct for less than three hours before her arrest was processed—which occurred at around 1:20 p.m. Although Maxwell indicates that the delay was actually six hours, (Maxwell Decl. ¶ 52), her own documentary evidence contradicts this claim.

██ Since, under recognized New York guidelines and practices, "the time it ordinarily should take to process an arres-

tee from the point of transfer from the precinct to Central Booking is three hours," *Gonzalez v. Bratton,* 147 F.Supp.2d 180, 201 (S.D.N.Y.2001), the nature of the alleged retaliatory conduct must be considered. Specifically, there is a question as to whether the alleged acts of retaliation are more than *de minimis.* *See Davidson v. Chestnut,* 193 F.3d 144, 150 (2d Cir.1999). "While ... the scope of conduct that can constitute actionable retaliation in the prison setting is broad, it is not true that every response to a prisoner's exercise of a constitutional right gives rise to a retaliation claim." *Dawes v. Walker,* 239 F.3d 489, 492–493 (2d Cir.2001). In order to be actionable, retaliation against a prisoner must be likely to "chill a person of ordinary firmness from continuing to engage" in activity protected by the First Amendment. *Id.; see also Thaddeus-X v. Blatter,* 175 F.3d 378, 397 (6th Cir.1999); *Bart v. Telford,* 677 F.2d 622, 625 (7th Cir.1982) ("It would trivialize the First Amendment to hold that harassment for exercising the right of free speech was always actionable no matter how unlikely to deter a person of ordinary firmness from that exercise.") "Otherwise, the retaliatory act is simply *de minimis* and therefore outside the ambit of constitutional protection." *Dawes,* 239 F.3d at 493.

█ In making this determination, the court's inquiry must be " 'tailored to the different circumstances in which retaliation claims arise,' bearing in mind that 'prisoners may be required to tolerate more ... than average citizens, before a [retaliatory] action taken against them is considered adverse.' " *Davis v. Goord,* 320 F.3d 346, 352 (2d Cir.2003) (quoting *Dawes,* 239 F.3d at 493). A prisoner's claims, moreover, must be examined with skepticism and particular care because they are "prone to abuse since prisoners can claim retaliation for every decision they dislike." *Graham,* 89 F.3d at 79 (quoting *Flaherty v. Cough-*

*lin,* 713 F.2d 10, 13 (2d Cir.1983)); *accord Dawes,* 239 F.3d at 491.

█ The harms alleged by Maxwell here, a delay in processing her arrest, which in the end did not fall outside the normal time period necessary for processing arrestees, or even crediting the time-delay in processing Maxwell's arrest as alleged by her, a delay in the provision of food, water and sanitary needs, as well as the refusal to voucher money, are not of the kind courts in this circuit have identified as legally sufficient to constitute retaliatory actions. *See, e.g., Morales v. Mackalm,* 278 F.3d 126, 131–32 (2d Cir.2002) (allegation that plaintiff was transferred to a psychiatric facility in retaliation for filing a sexual harassment grievance against defendant); *Henderson,* 89 F.3d at 80–81 (allegation that defendants filed false misbehavior reports against plaintiff in retaliation for his leadership in filing a grievance to protest the removal of workshop showers); *Colon,* 58 F.3d at 872–73 (2d Cir.1995) (allegation that defendant planted contraband in his cell in retaliation for plaintiff's filing two lawsuits against the facility); *Jones v. Coughlin,* 45 F.3d 677, 680 (2d Cir.1995) (allegation that defendants, in retaliation for plaintiff's filing administrative complaint, filed a false misbehavior report that led to 120 days of punitive segregation); *Van Pelt v. Finn,* 92 Civ. 2977, 1993 WL 465297, at *4–5 (S.D.N.Y.Nov.12, 1993) (allegation that defendants, upon learning about letters written by plaintiff to defendant's supervisor, reassigned plaintiff to a less desirable job with lower pay).

Rather, the delays and treatment alleged by Maxwell are *de minimis* inconveniences not unique to her circumstances or singularly directed at her, but of the kind normally experienced by other persons under arrest. The Court finds the alleged retaliatory conduct against Maxwell to be

*de minimis,* and therefore not substantial enough to allow a rational jury to conclude that a person of ordinary firmness would be deterred from seeking medical attention, if so needed, simply because of delays in processing and receiving food and water. *See Salahuddin v. Mead,* No. 95 Civ. 8581, 2002 WL 1968329, at *5 (S.D.N.Y. Aug.26, 2002) (being subjected to a thorough search resulting in a disciplinary charge as retribution for alleged protected speech was held to be an insufficient deterrent for retaliation claim to survive motion to dismiss); *Higgins v. Davis,* No. 95 Civ. 3011, 2001 WL 262930, *5 (S.D.N.Y. March 15, 2001) (granting summary judgment on plaintiff's retaliation claim because injury alleged, disallowance of emergency phone calls and prohibition from certain prison committees and programs, was *de minimis* ).

### E. *CONDITIONS OF CONFINEMENT*

█ Finally, Maxwell claims that the City of New York and former New York Police Department Commissioner Safir subjected her to unconstitutional conditions of confinement at Manhattan Central Booking after her June 26, 2000 arrest. Maxwell is suing the City for its custom and policy of maintaining such conditions and Safir for his personal involvement in not remedying these conditions. In response, Municipal Defendants argue that Maxwell has failed to establish an essential element of such a claim in accordance with *Monell v. Dep't of Soc. Servs.,* 436 U.S. 658, 690–692, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978): that a widespread municipal policy or practice of such conditions existed at Manhattan Central Booking. Moreover, Municipal Defendants claim that Safir, who is also being sued in his personal capacity, did not have administrative jurisdiction over the areas that are the subject of Maxwell's complaints, making his knowledge of those conditions irrelevant.

As Maxwell describes them, the conditions of her confinement at Manhattan Central Booking could create a sufficient factual issue to be presented to a jury as to whether those conditions amounted to "punishment of the detainee," as required for a prisoner awaiting trial to state a claim for unconstitutional conditions of confinement under the Fourteenth Amendment. *See Bell v. Wolfish,* 441 U.S. 520, 535–536, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979).

However, in order to state a claim against the City, or Safir in his official capacity, Maxwell must establish a widespread municipal policy or practice of maintaining such allegedly inhumane conditions. *Monell,* 436 U.S. at 690, 98 S.Ct. 2018; *Sorlucco v. New York City Police Dep't,* 971 F.2d 864, 871 (2d Cir.1992); *Dwares v. City of New York,* 985 F.2d 94, 100 (2d Cir.1993) ("In order to hold a municipality liable under § 1983 for the conduct of employees below the policymaking level, a plaintiff 'must show that the violation of his constitutional rights resulted from a municipal custom or policy.' ") (quoting *Ricciuti v. New York City Trans. Auth.,* 941 F.2d 119, 122 (2d Cir.1991)).

█ Although a plaintiff need not provide direct evidence of the custom or policy at issue, "the mere assertion that a municipality has such a custom or policy is insufficient in the absence of allegations of fact tending to support, at least circumstantially, such an inference." *Dwares,* 985 F.2d at 100 (citing *Batista v. Rodriguez,* 702 F.2d 393, 397 (2d Cir.1983); *Black v. Stephens,* 662 F.2d 181, 189 (3d Cir.1981); *Lewis v. Hyland,* 554 F.2d 93, 98 (3d Cir.1977)).

Whereas *Dwares* found mere allegations without factual support insufficient even to survive a motion to dismiss, in this case, on a motion for summary judgment, Maxwell must set forth factual support for her cus-

tom or policy allegations in order for the issue to properly go before a jury. Maxwell does not, however, indicate any basis for her belief that a custom or policy existed at Manhattan Central Booking; Maxwell merely recites that she will prove that a custom or policy existed at trial. (*See* Maxwell Mem. at 23–24.)

 Maxwell also brings a claim against Safir in his individual capacity for her alleged unconstitutional conditions of confinement. In order to hold Safir responsible for depriving her of a federal right, Maxwell must prove that Safir was personally involved in the deprivation. *See Williams v. Smith*, 781 F.2d 319, 323 (2d Cir.1986); *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir.1994). To establish personal involvement, Maxwell must demonstrate either (1) direct participation by the supervisory official; (2) a failure to remedy an alleged wrong after learning of the violation; (3) creation of a policy or custom under which the violation occurred; or (4) gross negligence in managing subordinates. *See Sealey v. Giltner*, 116 F.3d 47, 51 (2d Cir.1997).

Maxwell cites *Davis v. City of New York*, 142 F.Supp.2d 461 (S.D.N.Y.2001), in defense of the lack of evidence she has presented to support her claim of Safir's personal involvement. In *Davis*, the defendants produced no evidence to rebut plaintiffs' allegations, and the district court held that plaintiffs could survive summary judgment on mere allegations. *Id.* However, this case can be distinguished. Municipal Defendants explain that Safir was not responsible for the conditions of Manhattan Central booking because the holding cell in question was maintained by the Department of Corrections, not the New York City Police Department, which then employed Safir. In fact, in providing the Declaration of Linda LaGreca, Deputy General Counsel for the New York City Department of Corrections, (*see* Graziadei

Reply Declaration, dated December 18, 2002, Exh. C.), indicating Safir's lack of responsibility for the conditions of the holding cell about which Maxwell complains, Municipal Defendants do exactly what is necessary according to the Second Circuit to rebut Maxwell's allegations of Safir's personal knowledge, and thereby succeed on summary judgment: "[I]n seeking summary judgment ..., defendants did not submit an affidavit or other sworn evidence ... denying that they had knowledge of or responsibility for [the allegedly unconstitutional conditions]." *Gaston v. Coughlin*, 249 F.3d 156, 165 (2d Cir.2001). Accordingly, in the absence of any support for her unconstitutional conditions claim, Municipal Defendants' sworn denial of personal responsibility by Safir suffices to dispose of Maxwell's unsupported allegations. Mere allegations, without any evidence in support, despite the undisputed opportunity to conduct extensive discovery before this stage of the proceedings, are insufficient to allow Maxwell's claims to be tried before a jury.

### F. STATE LAW CLAIM OF NEGLIGENCE

 Municipal Defendants argue that the Court should dismiss Maxwell's state law negligence claims against the City because she failed to comply with the New York law requirement to file a notice of claim pursuant to General Municipal Law ("GML") §§ 50–e(1)(b). Under New York law, when suing the City or its employees acting in the scope of their employment, a plaintiff must file a notice of claim within ninety days after the incident giving rise to the claim. Negligence is a state law tort, not a constitutional violation, and must therefore be brought pursuant to state law. *See Stanley v. City of New York*, 587 F.Supp. 393, 396 (E.D.N.Y. 1984).

Maxwell offers no response to Municipal Defendants' motion to dismiss Maxwell's

state law negligence claims. Apparently, Maxwell has not filed the required notice of claim, and proffers no explanation for this failure. The Complaint, which includes notice of the state claims, was not filed until July 23, 2001, more than the applicable ninety-day requirement. Therefore, because Maxwell has failed to comply with a necessary condition for filing a claim against Municipal Defendants under New York law, and because the time to fulfill the filing requirement has since expired and is time-barred, her state law claims for negligence are dismissed. *See Dusenbury v. City of New York*, No. 97 Civ. 5215, 1999 WL 199072, at *2 (S.D.N.Y. April 9, 1999) (holding that failure to file a notice of claim within ninety days of the occurrence giving rise to the claim makes the claim time-barred and thus futile for purposes of a motion to amend); *Shakur v. McGrath*, 517 F.2d 983, 984–85 (2d Cir. 1975) (per curiam).

■ Finally, the Court declines to exercise pendent jurisdiction over Plaintiffs' state laws claims against the private defendants in this case, FBP and Blank, which claims are not between parties of diverse citizenship. *See Marcus v. AT&T Corp.*, 138 F.3d 46, 57 (2d Cir.1998) ("In general, where the federal claims are dismissed before trial, the state claims should be dismissed as well."); *Rounseville v. Zahl*, 13 F.3d 625, 631 (2d Cir.1994) ("It would be an inappropriate exercise of pendent jurisdiction and a waste of federal judicial resources for the District Court to hold a trial on a purely state claim.") The Supreme Court has noted that "in the usual case in which all federal-law claims are eliminated before trial, the balance of factors ... will point toward declining to

exercise jurisdiction over the remaining state-law claims." *Carnegie–Mellon University v. Cohill*, 484 U.S. 343, 350 n. 7, 108 S.Ct. 614, 98 L.Ed.2d 720 (1988). Accordingly, Plaintiffs' state law negligence claims no longer belong in federal court and should be filed in the appropriate state court.

### III. ORDER

For the foregoing reasons, it is hereby

**ORDERED** that Municipal Defendants' motion for summary judgment is granted; and it is further

**ORDERED** that the case is dismissed in its entirety without prejudice to Plaintiffs proceeding with their state law claims in the appropriate state court insofar as such claims may be properly pursued there.

The Clerk of the Court is directed to close this case.

**SO ORDERED.**

### DECISION AND ORDER

■ On July 14, 2003, the Court entered a Decision and Order in this matter granting summary judgment, pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, to defendants the City of New York (the "City"), Howard Safir, former Police Commissioner of the City of New York, in his individual and official capacity, and Police Officer Mannuzza ("Mannuzza"), shield no. 23890, in his individual and official capacity (collectively, "Municipal Defendants"). *See Maxwell v. City of New York*, 01 Civ. 6670, 2003 WL 21638216 (S.D.N.Y. July 10, 2003). Plaintiff Leah Maxwell ("Maxwell"), in a letter dated August 4, 2003 (the "Letter"), has requested leave to file a motion for reconsideration pursuant to Fed.R.Civ.P. 59(e).[1] In the

---

1. The Court notes that Maxwell's request to file a motion for reconsideration is untimely, having been made more than ten days after entry of the Decision. *See* Local Civil Rule 6.3 ("A notice of motion for reconsideration or reargument shall be served within ten (10) days after the docketing of the court's determination of the original motion.") Maxwell contends that she never received a copy of the

Letter, Maxwell sets forth the basis for her proposed motion. In the interest of judicial economy, the Court responds to Maxwell's request with a final decision and order on her proposed motion for reconsideration.[2] For the reasons set forth below, the motion for reconsideration is DENIED in its entirety.

■■■■ Reconsideration of a court's previous order is an "extraordinary remedy to be employed sparingly in the interests of finality and conservation of scarce judicial resources." *In re Health Management Sys. Inc. Secs. Litig.*, 113 F.Supp.2d 613, 614 (S.D.N.Y.2000). Under Local Civil Rule 6.3, which governs motions for reconsideration, the moving party must demonstrate controlling law or a factual matter before the court on the underlying motion that the movant believes the court overlooked and that might reasonably be expected to alter the court's decision. *See SEC v. Ashbury Capital Partners, L.P.*, No. 00 Civ. 7898, 2001 WL 604044, *1 (S.D.N.Y. May 31, 2001) (citing *AT & T Corp. v. Community Network Servs., Inc.*, No. 00 Civ. 316, 2000 WL 1174992, * 1 (S.D.N.Y. Aug.18, 2000) and Local Civil Rule 6.3). Reconsideration may be granted to correct clear error, prevent manifest injustice or review the court's decision in light of the availability of new evidence. *See Virgin Atlantic Airways, Ltd. v. Nat'l Mediation Bd.*, 956 F.2d 1245, 1255 (2d Cir.1992).

■■■■ A Rule 59(e) motion is not intended to be a vehicle for a party dissatisfied with a court's ruling to advance new theories that the movant failed to advance in connection with the underlying motion, nor to secure a rehearing on the merits with regard to issues already decided. *See Griffin Indus., Inc. v. Petrojam, Ltd.*, 72 F.Supp.2d 365, 368 (S.D.N.Y.1999). Consistent with these objectives, the strict parameters of Local Civil Rule 6.3 are designed to ensure "the finality of decisions and to prevent the practice of a losing party examining a decision and then plugging the gaps of a lost motion with additional matters." *See Ashbury*, 2001 WL 604044, at *1 (citing *Carolco Pictures, Inc. v. Sirota*, 700 F.Supp. 169, 170 (S.D.N.Y. 1988)). A court must narrowly construe and strictly apply Local Civil Rule 6.3, so as to avoid duplicative rulings on previously considered issues, and to prevent the rule from being used as a substitute for appealing a final judgment. *See Shamis v. Ambassador Factors Corp.*, 187 F.R.D. 148, 151 (S.D.N.Y.1999); *In re Houbigant, Inc.*, 914 F.Supp. 997, 1001 (S.D.N.Y.1996) (noting that a motion for reconsideration is not an opportunity for the moving party to "argue those issues already considered when a party does not like the way the original motion was resolved.")

Here, Maxwell claims that the Court made two errors that warrant reconsideration. First, in connection with her exces-

Court's Decision, but learned about it inadvertently the day the Letter was sent. According to the Court's records, a copy of the Decision was mailed to both parties on July 10, 2003. In any event, the Court will accept Maxwell's representation that she did not have notice of the Decision and consider the grounds for reconsideration advanced by Maxwell on the merits under Fed.R.Civ.P. 59(e) or, alternately, as a motion to amend the judgment pursuant to Rule 60(b). *See Gibson III v. Travaglin*, 164 F.3d 617, 1998 WL 646758 (2d Cir.1998) (Table) (because a

party may be entitled to a Rule 60(b) motion as well as a rule 59(e) motion, an untimely motion for reconsideration considered on the merits caused no prejudice); *Lewis v. United States*, 555 F.2d 1360, 1362 (motion filed after 10 days considered untimely Rule 59(e) motion but nonetheless reviewed on merits, presumably as Rule 60(b) motion).

2. Because the Court finds that reconsideration should be denied, the issuance of the instant decision without notice to Municipal Defendants causes no prejudice.

sive force claim, Maxwell argues that the Court incorrectly understood her deposition testimony with regard to the manner in which she was escorted into the police car by Mannuzza when she was arrested to contradict later statements she made in her affidavit submitted in opposition to Municipal Defendants' motion for summary judgment. Specifically, Maxwell argues that because upon being asked at her deposition, "Do you remember, though, whether you were shoved in head first so that you fell forward onto the seat ...," she answered, "No. I scraped my forehead against the thing that divides the perps from the police officers," that it was left unclear during the deposition whether or not she was pushed into the police car head first. (*See* deposition testimony of Maxwell ("Maxwell Dep."), dated June 12, 2002, attached as Exh. I to the Declaration of John H. Graziadei ("Graz.Decl."), dated November 1, 2002, at 75–76.) Therefore, Maxwell argues that it was proper for her to clarify her response in an affidavit submitted in opposition to summary judgment in which she indicates that she was "violently shoved head first into the police car."

However, Maxwell incorrectly cites the Court's Decision, omitting the clear question and response, directly preceding the one cited, that led this Court to hold that Maxwell should not be permitted to alter her deposition testimony in her opposition to Municipal Defendants' motion for summary judgment. In its Decision, the Court held that "with regard to being pushed in head first", in her additional affidavit [Maxwell] directly contradicts her deposition testimony, in which she indicates, in response to being questioned if she was pushed in head first, "I was shoved. I don't know. It was just like 'get in.'" *Maxwell*, 2003 WL 21638216, at *9. The question posed to Maxwell that elicited this very clear response was, "So, when he shoved you into the car, was it head first

or did he turn you around and seat you?" (Maxwell Dep. at 74–75.)

After unambiguously indicating, under oath, in response to a clear and precise question that she did not remember how she was "shoved" in the car, and that it was "just like 'get in,'" the Court can not permit Maxwell to reconsider her answer and thereafter give a different response later in the proceedings. As the Court explained in the Decision, "[a] party may not create an issue of fact by submitting an affidavit in opposition to a summary judgment motion that, by omission or addition, contradicts the affiant's previous deposition testimony." *Hayes v. New York City Dep't of Corrections*, 84 F.3d 614, 619 (2d Cir.1996). Moreover, the Court is not convinced that Maxwell's original testimony was "ambiguous, confusing or incomplete" so as to warrant elaboration. *Palazzo v. Corio*, 232 F.3d 38, 43 (2d Cir. 2000). Maxwell's cite to *Langman Fabrics v. Graff Californiawear*, 160 F.3d 106, 112 (2d Cir.1998), and *Palazzo* to support her position is unpersuasive because the question posed to her at her deposition and the response given, cited by the Court in the Decision, were clear, precise and unambiguous.

Therefore, that Maxwell, in response to another question, which Maxwell contends was focused on a different issue—as to whether or not she fell into the back seat—answered in a manner that was potentially ambiguous does not change the Court's determination that its reliance on the deposition testimony and not on Maxwell's subsequent affidavit is appropriate. Having carefully read through Maxwell's deposition, the Court is persuaded that the alleged force used by Mannuzza, as described by Maxwell herself, was not objectively unreasonable so as to create a constitutional violation. *See Finnegan v. Fountain*, 915 F.2d 817, 823 (2d Cir.1990).

Hence, there is no material fact in dispute to be determined by a jury with regard to Maxwell's excessive force claim.

Second, Maxwell claims that the Court erred by improperly indicating that she had not addressed Municipal Defendants' motion to dismiss Maxwell's state law negligence claim. However, the Court notes that Maxwell's response to the argument advanced by Municipal Defendants that she failed to file the required notice of claim with the City is in a footnote attached to the summary sentence under the "Conclusion" heading on page 26 of her brief. Pursuant to the Court's Individual Practices, opposition briefs are limited to 25 pages. Therefore, the Court does not believe Maxwell has reason to complain, nor should the Court reconsider its Decision in order to "correct" its alleged error.

In any event, even upon taking notice of page 26 of Maxwell's brief, Maxwell concedes in that footnote precisely what the Court found—that she failed to file a notice of claim with the City. Therefore, Maxwell withdraws her state law claim of negligence against Municipal Defendants, creating no substantive reason for the Court to alter the Decision in which it reaches the same result. The Court does note for the record, however, that Maxwell did address Municipal Defendants' argument for dismissing Maxwell's state law claims of negligence against Municipal Defendants on page 26, note 8, by admitting the she had not fulfilled the prerequisites for filing such a claim and therefore withdrawing her claim.

For the foregoing reasons, it is hereby

**ORDERED** that Maxwell's leave to file a motion for reconsideration of the Court's Decision entered on July 14, 2003 is DENIED; and it is further

**ORDERED** that the Clerk of the Court enter judgment dismissing Maxwell's claims against Municipal Defendants.

**SO ORDERED.**